# In the United States Court of Federal Claims

**OFFICE OF SPECIAL MASTERS**

| | | |
|---|---|---|
| KIMBERLY MOSLEY, Petitioner, | * | No. 22-1697V |
| v. | * | Special Master Christian J. Moran |
| SECRETARY OF HEALTH AND HUMAN SERVICES, Respondent. | * | Filed: July 13, 2026 |

Randall Knutson, Knutson Casey Law Firm, Mankato, MN, for petitioner;
Kimberly S. Davey, United States Dep't of Justice, Washington, DC, for respondent.

## DECISION DENYING ENTITLEMENT TO COMPENSATION[1]

Kimberly Mosley alleges that an influenza ("flu") vaccine caused her to develop transverse myelitis, which was manifest approximately 36 hours after the flu vaccination. Ms. Mosley principally relies upon opinions from treating neurologist Carlos A. Pardo-Villamizar, and retained expert Yuval Shafrir. Ms. Mosley also advocated through briefs.

The Secretary opposes an award of compensation. The Secretary relies upon two doctors whom he retained, Dara Jamieson and Thomas Forsthuber. The Secretary argued through one memorandum.

The evidence does not preponderate in favor of compensation. Ms. Mosley has not established that the biological sequence of events starting with a vaccination and leading to

[1] Because this decision contains a reasoned explanation for the action taken in this case, it must be made publicly accessible and will be posted on the United States Court of Federal Claims' website, and/or at https://www.govinfo.gov/app/collection/uscourts/national/cofc, in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2018) (Federal Management and Promotion of Electronic Government Services). This means the decision will be available to anyone with access to the internet. In accordance with Vaccine Rule 18(b), the parties have 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. Any changes will appear in the document posted on the website.

development of transverse myelitis can take place within approximately 36 hours. Thus, Ms. Mosley is not entitled to compensation.

## I. Events in Ms. Mosley's Medical History

As discussed in the analysis section below, the critical events are (1) that Ms. Mosley received the flu vaccination and (2) that she developed transverse myelitis within about 36 hours. Because these facts are undisputed, only a brief summary is provided. Accordingly, this recitation of events is short. For a more extensive recitation of events in Ms. Mosley's medical history, see Exhibit 39 (Dr. Shafrir's report) at 1-49.

Before the vaccination, Ms. Mosley worked as a nurse. Exhibit 9 (onset affidavit) ¶ 10. In four non-consecutive years before the allegedly causal vaccination, Ms. Mosley received annual doses of the flu vaccine. Exhibit 3 at 46, Exhibit 5 at 4.

Ms. Mosley received the allegedly causal flu vaccine on November 10, 2020. Exhibit 3 at 45, 489 (489 is a duplicate vaccination record). The vaccination record states that it was administered at 23:59 EST, in other words, just before midnight. Id.[2]

On November 13, 2020, Ms. Mosley went to an on-site clinic and complained about "numbness and tingling x 1 day." Exhibit 11 at 2. The nurse practitioner examined her and ordered labs for, among other things, a vitamin B12 deficiency.

On November 14, 2020, Ms. Mosley sought care in an emergency room. She reported that she had numbness and tingling that began in her hands and feet "2 days ago" and had spread to her abdomen "over the past 1 to 2 days." Exhibit 4 at 379. The plan was to admit her to the hospital for additional neurologic workup. Id. at 380.

Upon admission, she provided another history. The doctor memorialized that:

> Patient received her flu shot at work on 11/10. On Thursday, 11/12, she woke up with pins and needle sensation in her bilateral feet and hands. She also noticed gait disturbance at work as she is

---

[2] Ms. Mosley suggests that this time of vaccination was "implausible." Pet'r's Br., filed Oct. 22, 2024, at 2. But any "implausibility" appears not to affect the outcome of the case. Preliminarily, it seems plausible that a nurse working a night shift might receive a vaccine at approximately midnight. More importantly, as already mentioned, the parties agree that the onset of transverse myelitis was approximately 36 hours after the flu vaccination.

In an answer to an interrogatory propounded to her in the context of a claim for Workers' Compensation. Ms. Mosley averred that she received the flu vaccine at walk up tent when the temperature was 78 degrees. She further maintained that the flu vaccines were not properly kept cool. Exhibit 35 at 5; see also Exhibit 11 at 2. Resolution of that allegation is likewise unnecessary because Ms. Mosley's claim in this proceeding does not depend upon the temperature of the vaccine. See Exhibit 39 (Dr. Shafrir report, which does not discuss temperature).

> unable to feel her feet. For past 2 days, patient feels her tingling/numbness has ascended up into her arms and legs.

Exhibit 4 at 377.

Ms. Mosley underwent MRI scans. Significantly, the MRI of her cervical spine revealed an enhancing lesion. Id. at 505. A neurologist reviewed the MRI and concluded that Ms. Mosley "is experiencing transverse myelitis, etiology for which is unknown at this time." Id. at 439. The parties' retained experts agree with the diagnosis of transverse myelitis. Exhibit A (Dr. Jamieson's report) at 15.[3]

After Ms. Mosley was discharged from the hospital, she received treatment for her transverse myelitis. Generally, these medical records provide little, if any, information about the cause of her transverse myelitis.

Eventually, Ms. Mosley sought a second opinion about her neurologic problems from the Johns Hopkins Myelitis & Myelopathy Center, where she saw Dr. Pardo-Vilamizar. Exhibit 8 at 75-83 (Apr. 8, 2021). Dr. Pardo-Vilamizar obtained a history that, more or less, matched the history presented above, including a chronology in which the flu vaccination preceded the onset of neurologic problems. Dr. Pardo-Vilamizar examined her and reviewed her imaging. In Dr. Pardo-Vilamizar's view, "Mrs. Mosley presented with an inflammatory myelitis in November 2020 that appeared to be a monophasic and is unlikely to be related with any other disease process." Id. at 82. He ordered additional testing to look for other potential diseases and offered to speak with her home doctors. This workup was essentially negative. Exhibit 4 at 23-25.

Ms. Mosley's routine neurologist, Allen Desena, saw her on June 9, 2021. Ms. Mosley stated that she had "No new discrete neurologic events > 24 hours sustained recently." Exhibit 3 at 57. Dr. Desena also memorialized that "We had a lengthy discussion about etiology and, at this time, she is considered to have had idiopathic TM." Id.

Dr. Desena continued to treat Ms. Mosley over the next few months. In March 2022, Ms. Mosley returned to Dr. Pardo-Vilamizar. Exhibit 8 at 12. As noted below, Ms. Mosley initiated this litigation in November 2022.

In March 2023, Ms. Mosley saw Dr. Pardo-Vilamizar again for an annual visit. Dr. Pardo-Vilamizar noted that "most of her neurological symptoms that were described after her initial visit in 2021 persist[]." Exhibit 10 at 2. Dr. Pardo-Vilamizar reviewed an MRI from November 2022. This MRI showed a lesion that "has the appearance of residual injury of the cervical spinal cord produced by the inflammatory myelopathy likely triggered by vaccination [as] it was described previously in her HPI and original visit." Id. at 8.

---

[3] To be more precise, Dr. Jamieson stated that the lesion in Ms. Mosley's cervical spine "was not technically 'transverse.'" Nevertheless, Dr. Jamieson recognized that Ms. Mosley's "isolated sensory complaints . . . were consistent with cervical myelitis confined to the posterior columns of the cervical spinal." Exhibit A at 15.

In August 2023, Dr. Pardo-Vilamizar added to his previous notes. He wrote: "This addendum is to clarify previous statements outlined in my first and last clinical notes in which there are comments about the association of vaccination and the onset of an inflammatory myelopathy or clinical isolated demyelinating syndrome." Exhibit 12 at 1. Dr. Pardo-Vilamizar continued: "there was a temporal relationship between the administration of the vaccine for influenza, the onset of neurological symptoms and documentation of an inflammatory myelopathy by MRI." Id. After reviewing Ms. Mosley's course of illness, Dr. Pardo-Vilamizar commented upon causation:

> The temporal relationship between vaccination and the onset of neurological symptoms, documentation by MRI of the lesion of an inflammatory myelopathy or myelitis, establish the association between vaccination for influenza and onset of myelitis and support the view that the inflammatory spinal cord process was triggered by such vaccination. . . . Subsequently, the main conclusion is that the vaccination in the use [sic potentially "is the cause of"] the onset of an inflammatory myelopathy or myelitis.

Id. at 1-2.

Beyond the records summarized above, neither party relies extensively upon Ms. Mosley's subsequent treatment records in addressing entitlement. See Pet'r's Br. at 11; Resp't's Br. at 12. Although these records are not central to the parties' dispute, certain records are discussed, and warrant brief discussion.

Ms. Mosley relied upon Exhibit 33, an email from treating neurologist Dr. Allen Desena, to argue that Dr. Desena did not reject vaccine causation, but instead declined to offer a causation opinion because proving causation was difficult and recommended that Ms. Mosley obtain an independent neurologic evaluation. Ms. Mosley further emphasized that, although Dr. Pardo-Vilamizar ultimately opined that the influenza vaccination likely triggered Ms. Mosley's transverse myelitis, he nevertheless continued to recommend that she receive appropriate vaccinations. Ms. Mosley maintained that this recommendation was not inconsistent with Dr. Pardo-Vilamizar's causation opinion because a physician may conclude that a vaccine caused an adverse event in a particular patient while still recommending future vaccination based upon the overall balance of risks and benefits. Pet'r's Br. at 11.

The Secretary's experts likewise discussed these records. Dr. Jamieson cited Dr. Desena's email and Dr. Pardo-Vilamizar's treatment records in summarizing the treating physicians' opinions. Exhibit A at 10. Dr. Forsthuber also considered Dr. Pardo-Vilamizar's evaluations but disagreed with his causation conclusions based upon the scientific evidence concerning biological mechanism and timing, rather than because Dr. Pardo-Vilamizar recommended future vaccinations. Exhibit C at 14. Accordingly, these records are discussed because they frame the parties' competing views regarding the weight to be accorded to Dr. Pardo-Vilamizar's opinion, not because they materially alter the chronology of Ms. Mosley's medical care.

## II. Procedural History

Represented by Attorney Randall Knutson, Ms. Mosley initiated this claim in the Vaccine Program by filing a petition on November 17, 2022. Shortly after filing her petition, Ms. Mosley submitted medical records and other evidence. Ms. Mosley also filed an affidavit in which she averred that "approximately 2 days after receiving the influenza vaccination, [she] began to experience symptoms of transverse myelitis, including tingling and numbness in [her] hands and feet." Exhibit 2 (aff., dated Nov. 16, 2022) ¶ 5.

In the initial status conference, the relatively rapid onset was discussed. Mr. Knutson stated that he planned to seek information from a treating doctor that could confirm the date of onset. Order, issued Feb. 9, 2023.

On the date this information was expected, Ms. Mosley stated that she had seen Dr. Pardo-Vilamizar in late March and anticipated that the notes would be available soon. Pet'r's Status Rep., filed Apr. 12, 2023. Dr. Pardo-Vilamizar's notes from March 29, 2023, which were filed on April 26, 2023, say relatively little, if anything, about onset. See Exhibit 10. Some information about onset, however, was presented through a second affidavit filed April 12, 2023. In this affidavit, Ms. Mosley suggested that her neurologic problems started on November 13, 2020. Exhibit 9 ¶ 8.

In his Rule 4(c) Report, the Secretary reviewed the evidence and concluded that she was not entitled to compensation. Resp't's Rep., filed June 13, 2023. The Secretary requested that Ms. Mosley provide material from a workers' compensation claim. Id. at 8 n.3. The Secretary doubted the persuasiveness of statements from treating doctors and noted that Ms. Mosley had not retained an expert. Id. at 11. The Secretary also doubted whether "Ms. Mosley will be able to establish a less than two-day onset, as occurred here, is medically appropriate." Id. at 12 (footnote omitted).

Ms. Mosley presented information about her workers' compensation claim as Exhibits 14-37, many of which are medical records.[4] In response to an interrogatory, Ms. Mosley answered, in part, "36 hours later I woke up experiencing numbness in my feet and legs that ascended to neck level." Exhibit 35 at 5. This evidence was discussed in a status conference on October 3, 2023. In that status conference, Attorney Knutson stipulated that onset was approximately 36 hours after the vaccination. Order, issued Oct. 3, 2023. The parties have proceeded based upon this stipulation. See Pet'r's Br. at 3, 36; Resp't's Br. at 16. The parties planned to develop evidence as to whether the flu vaccine caused Ms. Mosley's transverse myelitis.

Ms. Mosley submitted a letter from Dr. Pardo-Vilamizar on December 18, 2023 as Exhibit 38. In this short (approximately one-half page) letter, Dr. Pardo-Vilamizar explained why "myelitis" is an appropriate diagnosis. Dr. Pardo-Vilamizar also stated: "it is very likely the vaccination she received produced a hyperacute neuroinflammatory response leading to acute

---

[4] Ms. Mosley started her workers' compensation claim on February 16, 2022. Exhibit 35 at 21. After mediation, she agreed to settle her claim. Id. at 73.

myelitis. The time profile of between vaccination and onset of symptoms of 36 hours, and documentation of myelitis is consistent with a hyperacute post-vaccinal reaction." Id.

In the ensuing status conference, the Secretary commented that Dr. Pardo-Vilamizar had provided relatively little analysis regarding the Althen prongs. Thus, Mr. Knutson anticipated retaining a doctor to opine on causation. This person turned out to be Dr. Shafrir.

*Dr. Shafrir and His Report.*

Background. Dr. Shafrir has participated in the Vaccine Program for many years. At first, the Secretary retained him. See, e.g., Raj v. Sec'y of Health & Hum. Servs., No. 96-294V, 2001 WL 963984 (Fed. Cl. Spec. Mstr. July 31, 2001). More recently, Dr. Shafrir has offered opinions on behalf of petitioners. See, e.g., Mohamad v. Sec'y of Health & Hum. Servs., No. 16-1075V, 2022 WL 711604 (Fed. Cl. Spec. Mstr. Jan. 27, 2022), mot. for rev. denied, 2024 WL 4943421 (Fed. Cl. 2024), appeal dismissed, No. 2025-1370, 2025 WL 1341189 (Fed. Cir. May 8, 2025).

Dr. Shafrir graduated from medical school in Israel in 1982. He completed pediatric residencies in Israel before coming to the United States. In 1986, Dr. Shafrir came to New York for his residency in pediatrics at North Shore University Hospital. Dr. Shafrir became board certified in pediatrics in 1991, but he did not seek recertification in pediatrics after 1998.

In July 1988, Dr. Shafrir started a residency and fellowship in pediatric neurology at Washington University, which he finished in 1991. He then had a pediatric neurophysiology and epileptology fellowship at Miami's Children's Hospital. He became board certified in neurology and psychiatry in 1993.

From 1995 to 2000, Dr. Shafrir acted as an assistant professor and then an associate professor of neurology first at Georgetown University and then the University of Oklahoma. After this aspect of his academic career ended, Dr. Shafrir taught residents and medical students at Sinai Hospital. He has written about 14 articles that have been published in peer-reviewed journals.

Report. Dr. Shafrir's report is 56 pages with an additional 3 pages for references. Exhibit 39. The bulk (about 49 pages) summarizes Ms. Mosley's medical history. While Dr. Shafrir's thoroughness is appreciated, many details about Ms. Mosley's medical history are not relevant to determining whether the flu vaccine harmed her.

In the remaining approximately seven pages, Dr. Shafrir discussed an association between multiple vaccines and transverse myelitis. With respect to the timing, Dr. Shafrir proposed that the short interval could be explained by either a "robust antibody mediated response of memory B cells" or "cytokines response to the influenza vaccination." Exhibit 39 at 51. Of the two, Dr. Shafrir preferred the latter. While acknowledging that he cannot provide "an exact description of the mechanism by which the influenza vaccination that Mrs. Mosley received caused the onset of her transverse myelitis," Dr. Shafrir stated that he "can provide a hypothetical mechanism which is solidly based on contemporary medical literature." Id. at 54. One mechanism is based upon the innate immune system, and the other is based upon the

adaptive immune system. Id. at 55. Dr. Shafrir also summarized his opinion as to why Ms. Mosley meets all of the Althen prongs.

The Secretary responded with reports from two people.

*Dr. Jamieson and Her Report*

Background. The Secretary first submitted a report from neurologist Dr. Dara Jamieson. Dr. Jamieson is a clinical associate professor of neurology at Weill Cornell Medicine. Before having this academic appointment, she practiced neurology for more than 30 years. She became board-certified in psychiatry and neurology in 1987.

Report. Dr. Jamieson's report is 25 pages. Exhibit A. Dr. Jamieson's summary of the medical records runs from page 2 to 15. She discussed transverse myelitis. Id. at 16-17. Dr. Jamieson discussed whether the influenza vaccine is associated with transverse myelitis, referencing epidemiological studies and case reports. She concluded: "No epidemiological or pathophysiological evidence in the medical literature provides a causative link between her vaccination and transverse myelitis." Id. at 25. She also found that the short period between vaccination and the onset of paresthesias (a range of 33 to 39 hours) "is not supported by medical literature." Id.

*Dr. Forsthuber and His Report*

Background. The Secretary also retained immunologist Dr. Thomas Forsthuber. Dr. Forsthuber is a professor of immunology and endowed chair of biotechnology at the University of Texas at San Antonio. He has more than 25 years of experience in immunology and has authored more than 100 articles published in peer-review journals.

Report. Dr. Forsthuber's report is approximately 50 pages and has three pages for references. Like the other experts, Dr. Forsthuber begins his report with his qualifications, list of items that he reviewed, and a summary of medical facts. Dr. Forsthuber's summary is found on pages 2-11. He also described acute transverse myelitis for about one page. Exhibit C at 11-12.

The remaining approximately 40 pages is a detailed response to Dr. Shafrir. See Id. at 12-48. The first portion, running from pages 12-17, concerns corrections and commentary about how Dr. Shafrir summarized Ms. Mosley's medical history.

The more important aspect is how Dr. Forsthuber responded to Dr. Shafrir's medical theories. Dr. Forsthuber addressed the various case reports and articles Dr. Shafrir cited. See Exhibit C at 17-24. Dr. Forsthuber wrote about the development of secondary antibody responses by memory B cells. Id. at 24-27. He extensively explained the science of how antibodies are produced and Dr. Forsthuber concluded that "reliable scientific evidence conclusively disproves Dr. Shafrir's theory that the influenza vaccine could induce TM in K.M. within 36 hours." Id. at 27. Dr. Forsthuber also responded to Dr. Shafrir's theory based on cytokines. He devoted about nine pages criticizing an article on which Dr. Shafrir (and other experts assisting Ms. Mosleys in the Vaccine Program) relied: Talaat. Id. at 27-36 (Talaat, and medical articles are cited in the Appendix). Dr. Forsthuber added more criticisms about the cytokine theory, emphasizing that the flu vaccine leads to the production of a relatively small

amount of cytokines, much less than any amount that could cause an attack on the nerves in the spinal cord. Id. at 36-43. Dr. Forsthuber discussed molecular mimicry and why Dr. Shafrir's reliance on that concept is not persuasive. Id. at 43-46. Dr. Forsthuber's report ends with a summary of bullet points against Dr. Shafrir's overall opinion. Id. 48-50. Dr. Forsthuber concluded that "Dr. Shafrir did not provide any reliable evidence, compelling arguments, or plausible theories to support a role for the Ms. Mosley's vaccination." Id. at 50.

Ms. Mosley did not submit any reports in response to the reports from Dr. Jamieson and Dr. Forsthuber. See Pet'r's Status Rep., filed Aug. 14, 2024. Thus, the parties were directed to advocate through briefs. Order, issued Aug. 15, 2024.

Attorney Knutson wrote a lengthy primary brief, which was filed October 22, 2024. In this brief, Ms. Mosley requested a ruling on the record in her favor. The Secretary argued against an award of compensation through a brief filed on December 19, 2024.

Ms. Mosley next filed a reply brief on January 21, 2025. However, many of the points in the reply brief were new arguments, mostly attacks against Dr. Forsthuber. For example, Ms. Mosley wrote a paragraph about the Borchers article (Pet'r's Reply at 4) but neither Ms. Mosley in her opening brief nor the Secretary in his brief cited Borchers. This happens for at least seven articles. Raising new arguments in a reply is disfavored. See SmithKline Beecham, Corp. v. Apotex Corp., 439 F.3d 1312, 1320 (Fed. Cir. 2006).

With the filing of the reply brief, the case is ready for adjudication.

## III. Standards for Adjudication

A petitioner is required to establish each element of her claim by a preponderance of the evidence. 42 U.S.C. § 300aa–13(1)(a). The preponderance of the evidence standard requires a "trier of fact to believe that the existence of a fact is more probable than its nonexistence before [he] may find in favor of the party who has the burden to persuade the judge of the fact's existence." Moberly v. Sec'y of Health & Hum. Servs., 592 F.3d 1315, 1322 n.2 (Fed. Cir. 2010) (citations omitted). Proof of medical certainty is not required. Bunting v. Sec'y of Health & Hum. Servs., 931 F.2d 867, 873 (Fed. Cir. 1991).

Distinguishing between "preponderant evidence" and "medical certainty" is important because a special master should not impose an evidentiary burden that is too high. Andreu v. Sec'y of Health & Hum. Servs., 569 F.3d 1367, 1379-80 (Fed. Cir. 2009) (reversing special master's decision that petitioners were not entitled to compensation); see also Lampe v. Sec'y of Health & Hum. Servs., 219 F.3d 1357 (Fed. Cir. 2000); Hodges v. Sec'y of Health & Hum. Servs., 9 F.3d 958, 961 (Fed. Cir. 1993) (disagreeing with dissenting judge's contention that the special master confused preponderance of the evidence with medical certainty).

## IV. Elements of a Claim

The Vaccine Act requires petitioners establish five elements. 42 U.S.C. § 300aa–11(c)(1)(A) through (E). Here, the dispute concerns the third element, causation. To establish causation, petitioners may rely upon the Vaccine Injury Table, which establishes a presumption

of causation for certain vaccine-injury combinations. However, Ms. Mosley has not alleged an on-Table claim. Thus, she is necessarily pursuing an off-Table claim.

For off-Table cases, petitioners bear a burden "to show by preponderant evidence that the vaccination brought about [the vaccinee's] injury by providing: (1) a medical theory causally connecting the vaccination and the injury; (2) a logical sequence of cause and effect showing that the vaccination was the reason for the injury; and (3) a showing of a proximate temporal relationship between vaccination and injury." Althen v. Sec'y of Health & Hum. Servs., 418 F.3d 1274, 1278 (Fed. Cir. 2005).

## V. Analysis Part One: Opinions from Treating Doctors

The opinions of Ms. Mosley's treating physicians bear most directly on Althen prong two as they address whether the vaccination caused Ms. Mosley's transverse myelitis. However, part of assessing the weight accorded those opinions also depends, in part, upon whether they articulate a biologically plausible mechanism of causation (prong one) and account for the approximately 36-hour interval between vaccination and symptom onset (prong three). Accordingly, the treating physicians' opinions are discussed here, while the scientific evidence relating to Althen prongs one and three is examined in greater detail below.

Dr. Pardo-Vilamizar provides limited support to Ms. Mosley's claim for entitlement. In an addendum and a separate letter, he opined that the vaccine caused (or triggered) Ms. Mosley's myelitis. See Exhibit 12 at 1-2 and Exhibit 38. Dr. Pardo-Vilamizar's opinions weigh in Ms. Mosley's favor.

However, there are multiple reasons for discounting the value of Dr. Pardo-Vilamizar's opinions. Preliminarily, as a legal principle, "[T]here is nothing ... that mandates that the testimony of a treating physician is sacrosanct—that it must be accepted in its entirety and cannot be rebutted." Snyder v. Sec'y of Health & Hum. Servs., 88 Fed. Cl. 706, 745 n.67 (2009). For example, the Federal Circuit ruled that a special master was not arbitrary in rejecting the opinion from a treating doctor that 11 hours was a medically appropriate interval. Bazan v. Sec'y of Health & Hum. Servs., 539 F.3d 1347 (Fed. Cir. 2008).

The circumstances in which Dr. Pardo-Vilamizar offered his causation opinions also matter. Dr. Pardo-Vilamizar first saw Ms. Mosley in April 2021, approximately five months after the vaccination and onset of the transverse myelitis. Thus, despite Dr. Pardo-Vilamizar's stature and experience in working at the Johns Hopkins Myelitis & Myelopathy Center, he lacks firsthand knowledge of how Ms. Mosley was when she was hospitalized. More importantly, on the first two occasions in which Dr. Pardo-Vilamizar saw Ms. Mosley, Dr. Pardo-Vilamizar did not express an opinion that the flu vaccine caused her transverse myelitis. See Exhibit 8 at 76 (Apr. 8, 2021) and id. at 12 (Mar. 2, 2022).

It was only after Ms. Mosley sought compensation through the workers' compensation system and the Vaccine Program that Dr. Pardo-Vilamizar wrote that the flu vaccine caused her transverse myelitis. A delay in proposing that a vaccine caused an injury is a factor that a special master may consider in weighing the value of a treater doctor's opinion. See Duncan v. Sec'y of Health & Hum. Servs., 153 Fed. Cl. 642, 663 (2021).

While it is not absolutely certain that Ms. Mosley's claims for compensation affected Dr. Pardo-Vilamizar, it is clear that Mr. Knudson planned to solicit a report from Dr. Pardo-Vilamizar. This solicitation of a report from a treating doctor, in turn, is not unethical. But, the circumstances do suggest that Dr. Pardo-Vilamizar's opinions about vaccine-causation should be interpreted cautiously. See Zumwalt v. Sec'y of Health & Hum. Servs., 146 Fed. Cl. 525, 540-41 (2019) (ruling that a special master was not arbitrary in noting that a treating doctor first discussed vaccine-causation after the case was filed); Alsaadeh v. Sec'y of Health & Hum. Servs., No. 19-1097V, 2024 WL 694072, at *38 (Fed. Cl. Spec. Mstr. Jan. 23, 2024) (declining to give much weight to a letter from a treating doctor that was prepared for litigation); see also Milik v. Sec'y of Health & Hum. Servs., 822 F.3d 1367, 1380-81 (Fed. Cir. 2016) (ruling that a special master's characterization of a letter from a treating doctor as "litigation driven," was not necessarily erroneous when the special master provided other reasons for not crediting this opinion). These considerations are not dispositive. A treating physician's opinion is not discounted merely because it was rendered after litigation began. Rather, the weight accorded any treating physician's opinion depends principally upon the quality of the physician's reasoning, the factual foundation for the opinion, and its consistency with the contemporaneous medical records and the remaining medical evidence.

The primary reason Dr. Pardo-Vilamizar's latter opinions receive limited weight is that they assert, rather than explain, causation. He concludes that the influenza vaccine caused Ms. Mosley's transverse myelitis but does not identify the medical reasoning or evidence supporting that conclusion, particularly given the unusually short interval—approximately 36 hours—between vaccination and symptom onset. He has not identified any information that prompted a revision in his assessment compared to the first two reports. While it is true that Dr. Pardo-Vilamizar belatedly stated that the flu vaccine caused neurologic problems in this short time, the persuasiveness of this statement would have been enhanced if Dr. Pardo-Vilamizar explicated how he reached this conclusion or why such a rapid onset is biologically plausible. Special masters may decline to give much weight to conclusory letters written by treating doctors. See, e.g., Orloski v. Sec'y of Health & Hum. Servs., 839 Fed. App'x 538, 541-42 (Fed. Cir. Jan. 14, 2021) (ruling that the special master did not commit a reversible error in refraining from crediting the report from a treating doctor that did not address "a mechanism" for how vaccines could have caused the petitioner's injury); Townsend v. Sec'y of Health & Hum. Servs., 170 Fed. Cl. 130, 145 (2024) (ruling a special master was not arbitrary in declining to credit a letter from a treating doctor that "did not explain or describe the basis for his opinion"), aff'd, No. 2024-1740, 2026 WL 570042 (Fed. Cir. Mar. 2, 2026), reh'g pending; Sparrow v. Sec'y of Health & Hum. Servs., 173 Fed. Cl. 177, 221–22 (2024) (explaining that although treating physicians deserve deference regarding a patient's condition, that deference "does not extend to the physician's broader views on defining diseases and identifying their causes"), appeal docketed, No. 25-1161 (Fed. Cir. May 7, 2025); Hayman v. United States, No. 02-725, 2005 WL 6124101, *at 7 (Fed. Cl. June 1, 2005) (denying a motion for review and ruling that a special master was not arbitrary in not crediting a letter from a treating doctor "failed to elaborate how the vaccination" caused petitioner's condition).

Finally, Dr. Pardo-Vilamizar's statements of vaccine-causation must be considered as two items in a much larger record. See 42 U.S.C. § 300aa-13(a) (requiring special master to consider the entire record). Ms. Mosley's primary neurologist, Dr. Desena, described her

transverse myelitis as "idiopathic." Exhibit 3 at 57 (June 9, 2021). Thus, there is an inconsistency between the two treating neurologists, further lessening the value of Dr. Pardo-Vilamizar's opinion.[5] See Zumwalt, 146 Fed. Cl. at 540-41 (ruling a special master may find a treating doctor's opinion about vaccine-causation deserving less weight when this opinion is not shared by other treating doctors).

## VI. Analysis Part Two: Qualifications of Retained Experts

Special masters may consider the relative expertise of testifying experts when weighing the persuasiveness of their opinions. See Depena v. Sec'y of Health & Hum. Servs., No. 13-675V, 2017 WL 1075101 (Fed. Cl. Spec. Mstr. Feb. 22, 2017), mot. for rev. denied, 133 Fed. Cl. 535, 547-48 (2017), aff'd without op., 730 Fed. App'x 938 (Fed. Cir. 2018); Copenhaver v. Sec'y of Health & Hum. Servs., No. 13-1002V, 2016 WL 3456436 (Fed. Cl. Spec. Mstr. May 31, 2016), mot. for rev. denied, 129 Fed. Cl. 176 (2016).

Here, there is a disparity in expertise in immunology. Dr. Forsthuber is a professor of immunology. Although he is a medical doctor (and completed residency in pathology), his current professional work is in immunology research rather than the clinical practice of medicine. Dr. Shafrir has no specialized training in immunology. Other opinions have pointed out Dr. Shafrir's relative lack of experience in immunology. See, e.g., Kinney v. Sec'y of Health & Hum. Servs., No. 18-1522V, 2024 WL 2831616, at *10 n.5 (Fed. Cl. Spec. Mstr. May 8, 2024) ("Dr. Shafrir confirmed that he had no training in immunology subsequent to medical school"); T.M. v. Sec'y of Health & Hum. Servs., No. 08-284V, 2016 WL 11087157, at *12 n.20 (Fed. Cl. Spec. Mstr. Aug. 9, 2016) (suggesting that because Dr. Shafrir is not an immunologist, he does not possess "the professional experience" to opine about homology); Cunningham v. Sec'y of Health & Hum. Servs., No. 13-483V, 2016 WL 4529530, at *16 (Fed. Cl. Spec. Mstr. Aug. 1, 2016) ("despite advancing a theory steeped in immunology, Dr. Shafrir is not himself an immunologist"); R.V. v. Sec'y of Health & Hum. Servs., No. 08-504V, 2016 WL 3882519, at *15 (Fed. Cl. Spec. Mstr. Feb. 19, 2016). Accordingly, to the extent the parties' experts disagree about immunological principles, Dr. Forsthuber's opinions generally are accorded greater weight.

## VII. Analysis Part Three: Medical Literature, including Epidemiology, Case Series, and Case Reports

An overarching question is whether the medical literature supports the claim that flu vaccines can cause transverse myelitis. A large part of the experts' opinions address epidemiologic studies, case reports, and case series. Thus, these topics are evaluated below.

---

[5] The June 9, 2021 report carries more weight than Dr. Desena's January 4, 2022 email with the subject "Worker's Compensation Lawsuit." There, it appears that Dr. Desena seemed at least concerned that his employment might be complicated if he offered an opinion that a vaccine, which his employer mandated, harmed Ms. Mosley. Exhibit 33 at 1.

### A. Epidemiologic Studies

#### 1. Ms. Mosley's Perspective

Dr. Shafrir did not cite any epidemiologic study directly addressing whether influenza vaccination causes transverse myelitis. See Exhibit 39. Rather, to support the claim that flu vaccines can cause transverse myelitis, Dr. Shafrir relies upon an article about Covid vaccines. Exhibit 39 at 49-50. The article by Nguyen and colleagues evaluated potential adverse reactions to Covid vaccines in Europe and collected in Vigibase. Exhibit 46.

Dr. Forsthuber, however, criticized Dr. Shafrir's reliance on Nguyen for several reasons. Exhibit C at 21. One problem is that VigiBase, similar to the Vaccine Adverse Event Reporting System in the United States, is a passive reporting system that cannot establish causation. See Knorr v. Sec'y of Health & Human Servs., No. 15-1169V, 2018 WL 6991548, at *12 n.13 (Fed. Cl. Spec. Mstr. Dec. 7, 2018) (describing VigiBase). Another problem is that Ms. Mosley's claim is based upon the flu vaccine not a Covid vaccine.

The degree to which Ms. Mosley is relying upon Nguyen is not readily apparent. She did not cite Nguyen in her principal brief, despite previously being directed to develop her expert causation theory through an expert report addressing the pertinent medical literature. See Order, filed Jan. 16, 2024, at 1. Ms. Mosley first discussed Nguyen in her reply. See Pet'r's Reply at 6-7. Arguments first raised in a reply brief generally are disfavored. See SmithKline, 439 F.3d at 1320. In any event, Ms. Mosley did not persuasively respond to Dr. Forsthuber's criticisms of Nguyen. Accordingly, Nguyen merits relatively little, if any, weight in the analysis of Althen prong one that follows below.

#### 2. The Secretary's Perspective

The neurologist whom the Secretary retained, Dr. Jamieson, asserted: "Epidemiological studies do not support a causative association between influenza vaccination and transverse myelitis." Exhibit A at 17. She relied upon two studies, one by Baxter and the other by Shi.

Whether the Secretary is relying upon Baxter and Shi is also difficult to discern. The Secretary did not cite these studies in his brief. Thus, by the same authorities, the Secretary can be considered to have forfeited any reliance upon Baxter and Shi. Regardless, resolution of that issue is unnecessary because Ms. Mosley has failed to satisfy her burden even without consideration of those studies.

### B. Case Series and Case Reports

Case reports and case series are considered together. In general, case reports provide relatively little, if any, reliable information about causation. See K.O. v. Sec'y of Health & Hum. Servs., No. 13-472V, 2016 WL 7634491, at *11-12 (Fed. Cl. Spec. Mstr. July 7, 2016) (discussing appellate precedent on case reports).

Despite the minimal value of case reports, Dr. Shafrir cites many case reports and case series without providing any persuasive reason for why these case reports should be considered reliable evidence for causation. See, e.g., Exhibit 39 at 49-50. Ms. Mosley, in turn, did not cite

most of the case reports and case series in her primary brief, leading to a question about forfeiture.

The case series on which Ms. Mosley appears to have placed the most emphasis is Agmon-Levin. See Pet'r's Br. at 26. The researchers in Agmon-Levin queried various sources to locate 37 instances in which transverse myelitis developed after various vaccines across 39 years. Perhaps due to the breadth of its scope, Agmon-Levin is one of the more frequently articles cited in the Vaccine Program. Agmon-Levin is sometimes, but not always, found to be unpersuasive. Bowling v. Sec'y of Health & Hum. Servs., No. 18-109V, 2023 WL 6846491, at *14 (Fed. Cl. Spec. Mstr. Sep. 20, 2023) (citing I.J. v. Sec'y of Health & Hum. Servs., No. 16-864V, 2022 WL 277555, at *5 (Fed. Cl. Spec. Mstr. Jan. 4, 2022)); Pearson v. Sec'y of Health & Hum. Servs., No. 16-9V, 2019 WL 3852633, at *9 (Fed. Cl. Spec. Mstr. July 31, 2019) (summarizing a report from an expert respondent retained).

Here, Dr. Forsthuber appears to have investigated Agmon-Levin more thoroughly. Agmon-Levin and colleagues identified four case reports in which the time between vaccination and the onset of transverse myelitis was reported to be two days (Label), two days (D'Costa), three days (Abdul-Ghaffar), or four days (Holt). Agmon-Levin at 1200 (Table 1). From this group of four, Dr. Forsthuber explained that for three of these underlying reports, Agmon-Levin and colleagues "misrepresented and misquoted the literature." Exhibit C at 19. Dr. Forsthuber did not criticize how Agmon-Levin used Abdul-Ghaffar. However, for Label, the onset of transverse myelitis was 11 days (not two days as presented in Agmon-Levin). The underlying Label article, which The Secretary submitted, confirms Dr. Forsthuber's observation regarding the reported interval between vaccination and onset. Exhibit C-15. For D'Costa, the subject had been suffering from an upper respiratory infection for five weeks before she received vaccines, which was, in turn, 48 hours before she developed transverse myelitis. The presence of the upper respiratory infection confounds any assertion that the vaccine caused the transverse myelitis. For Holt, the subject also had multiple pre-existing medical conditions. Thus, the overall value of Agmon-Levin, which was already infirm, is weakened further.

While Agmon-Levin was featured in Ms. Mosley's primary brief, other case series and case reports appear in her reply. For example, her reply cites Karussis, which does not support a finding of causation. Pet'r's Reply at 7-8; Orloski v. Sec'y of Health & Hum. Servs., 839 Fed. App'x 538, 542 (Fed. Cir. 2021); Mathis v. Sec'y of Health & Hum. Servs., No. 20-431V, 2023 WL 5436135, at *7-8 (Fed. Cl. Spec. Mstr. Aug. 1, 2023). Ms. Mosley also relies upon the case reports by Kumar, Sato, Akkad and Korn-Lubetzki. As with the other case reports discussed above, these publications describe isolated clinical observations and therefore add only limited support to Ms. Mosley's causation claim. More importantly, Dr. Forsthuber identified significant confounding factors in the Akkad and Korn-Lubetzki reports, including preceding infections and unresolved alternative explanations, diminishing their persuasive value. Although Ms. Mosley argues that Vaccine Act petitioners are not required to eliminate every possible alternative cause, that argument addresses Ms. Mosley's ultimate burden of proof rather than the weight accorded to these individual publications. Given the unresolved confounding factors and the absence of evidence addressing the unusually short 36-hour onset in this case, these reports do not materially strengthen Ms. Mosley's causation theory.

Accordingly, the medical literature offers little, if any, support for the claim that flu vaccine can cause transverse myelitis, a topic further discussed with in the context of Althen prong one below. The epidemiological evidence is neutral, at best. The case reports and case series carry little weight. Although literature is not required, Althen, 418 F.3d at 1278-80, "a scientific theory that lacks any empirical support will have limited persuasive force." Caves v. Sec'y of Health & Hum. Servs., 100 Fed. Cl. 119, 134 (2011), aff'd without opinion, 463 F. App'x 932 (Fed. Cir. 2012). Nevertheless, Ms. Mosley's other evidence, the opinions from Dr. Shafrir, are considered next.

## VIII. Analysis Part Four: Dr. Shafrir's Opinions

Dr. Shafrir has at least attempted to delineate some explanation for how a vaccine can cause myelitis within such a short amount of time: either via molecular mimicry or cytokines. These two theories are analyzed separately. Langland v. Sec'y of Health & Hum. Servs., 109 Fed. Cl. 421, 443 (2013) (noting that the medically acceptable timeframe depends, at least in part, on the theory being offered). To receive compensation, Ms. Mosley must establish with preponderant evidence each of the Althen prongs. Dennington v. Sec'y of Health & Hum. Servs., 167 Fed. Cl. 640, 654 (2023); Henkel v. Sec'y of Health & Hum. Servs., 165 Fed. Cl. 153, 162–63 (2023); see also Osenbach v. Sec'y of Health & Hum. Servs., No. 2024-1663, 2025 WL 2387944 (Fed. Cir. Aug. 18, 2025) (stating petitioners are required to establish all prongs in a significant aggravation case).

### A. Molecular Mimicry

#### 1. Introduction

Dr. Shafrir's description of molecular mimicry is relatively short. Exhibit 39 at 55. Helpful details can be found in Dr. Forsthuber's report. Dr. Forsthuber has defined molecular mimicry as "the induction of T cells, B cells, and/or antibodies that cross-react between antigens [or] microorganisms and host self-antigens, and this cross-reactivity may lead to autoimmune disease pathology." Exhibit C at 43. Special masters are familiar with molecular mimicry as it is (maybe) the primary theory offered to explain how a vaccine can be the cause-in-fact of an injury. See Hoffman v. Sec'y of Health & Hum. Servs., No. 19-111V, 2024 WL 4444773, at *5 (Fed. Cl. Spec. Mstr. Sept. 13, 2024).

Molecular mimicry is a shorthand expression for a theory containing multiple steps. McGill v. Sec'y of Health & Hum. Servs., No. 15-1485, 2023 WL 3813524, at *19 (Fed. Cl. Spec. Mstr. May 11, 2023); Forrest v. Sec'y of Health & Hum. Servs., No. 14-1046V, 2019 WL 925495, at *6 (Fed. Cl. Spec. Mstr. Jan. 28, 2019) (finding that petitioner did not establish that approximately 36 hours was an adequate amount of time for molecular mimicry to occur). The multiplicity of steps contributes to understanding how long the theory takes.

#### 2. *Althen* Prong One

Whether molecular mimicry is a reliable theory to explain how a flu vaccine can cause transverse myelitis remains the subject of disagreement among special masters. Compare Johnson v. Sec'y of Health & Hum. Servs., No. 18-410V, 2025 WL 1942989 (Fed. Cl. Spec. Mstr. June 17, 2025) (finding the evidence insufficient to establish molecular mimicry as a

reliable mechanism for influenza vaccine-induced transverse myelitis)); and Bowling v. Sec'y of Health & Hum. Servs., No. 18-109V, 2023 WL 6846491 (Fed. Cl. Spec. Mstr. Sep. 20, 2023) (similarly rejecting molecular mimicry) with Songero v. Sec'y of Health & Hum. Servs., No. 18-300V, 2025 WL 3013090, at *18 (Fed. Cl. Spec. Mstr. Oct. 3, 2025) (crediting molecular mimicry); and Le v. Sec'y of Health & Hum. Servs., No. 16-1078V, 2023 WL 3049203 (Fed. Cl. Spec. Mstr. Mar. 30, 2023) (crediting molecular mimicry in the context of tetanus-diphtheria-acellular pertussis vaccine causing transverse myelitis).

Those differences need not be resolved in Ms. Mosley's case because even if molecular mimicry could be credited in some contexts, Ms. Mosley cannot prevail based upon molecular mimicry theory in her case due to the timing. Thus, the Althen prong regarding timing is discussed next.

3. *Althen* Prong Three

The third Althen prong actually contains two parts. A petitioner must show the "timeframe for which it is medically acceptable to infer causation" and the onset of the disease occurred in this period. Shapiro v. Sec'y of Health & Hum. Servs., 101 Fed. Cl. 532, 542-43 (2011), recons. denied after remand on other grounds, 105 Fed. Cl. 353 (2012), aff'd without op., 503 F. App'x 952 (Fed. Cir. 2013).

Of the two parts to the third Althen prong, one is not disputed. The parties agree that Ms. Mosley started to manifest her transverse myelitis within about 36 hours. Thus, the ensuing question is whether 36 hours is a timeframe for which an inference of causation is appropriate.

Here, there is a relatively meager amount of evidence supporting the assertion that 36 hours is appropriate. Regarding the acceptability of the 36-hour onset, Ms. Mosley's brief is relatively short. Her arguments are found on pages 26-28 and 32 of her primary brief. Beyond recognizing the parties' agreement that Ms. Mosley's neurologic problem started about 36 hours after vaccination, almost nothing is said in Ms. Mosley's reply about whether the flu vaccine can cause transverse myelitis in about 36 hours.

Quoting a textbook by Kaiser, Dr. Shafrir states: "The primary response to a new antigen generally peaks at 5-10 days. IgM is made first later to be replaced by IgG." Exhibit 39 at 51. Dr. Shafrir proposes that Ms. Mosley's production of immunoglobulin in response to the November 10, 2020 vaccination was accelerated because she had encountered the flu vaccine earlier. These previous exposures meant that her vaccination was a memory immune response. (A medical term for a memory immune response is an "anamnestic" response. See Dorland's Illus. Med. Dictionary 73 (33rd ed).) Further quoting Kaiser, Dr. Shafrir continues: "Because of the numerous circulating B-memory cells and T4-memory cells from the primary response, however, the secondary anamnestic response peaks in only 1-3 days." Dr. Shafrir adds a reference to an article by Carine Claeys et al. (Exhibit 53) and otherwise does not elaborate on the rapidity of response for the adaptive immune system. See Exhibit 39 at 51; see also Pet'r's Br. at 26-27 (summarizing Dr. Shafrir's timing theory based on an anamnestic response).

The Kaiser submission is not credited as persuasive. A few preliminary points about Kaiser article. First, Dr. Shafrir supplied just two pages from this textbook. Without more context, it is difficult to assess to whom the textbook is addressed. A textbook for college

students may be less precise than a textbook for medical school students. Second, the Kaiser article or textbook appears not to have been cited by any special master.

More substantively, the suggestion that the recall response peaks within three days is not consistent with a passage from the Institute of Medicine that is relatively well known in the Vaccine Program, which discusses the phases of an immune response. See True v. Sec'y of Health & Hum. Servs., No. 21-2110V, 2025 WL 1343027, at *12 (Fed. Cl. Spec. Mstr. Apr. 11, 2025) (stating that Ms. Mosley's expert did not explain how a recall response can happen within one day or two days); Rowan v. Sec'y of Health & Hum. Servs., No. 17-760V, 2020 WL 2954954, at *17 (Fed. Cl. Spec. Mstr. Apr. 28, 2020) (finding that petitioner's expert did not establish a 36-hour onset is appropriate for a recall response).

Finally, and most importantly, Dr. Forsthuber explains the process by which memory B cells mature into plasma cells, which are the primary source of antibodies. Exhibit C at 25-26. Dr. Forsthuber's delineation, which is supported by citing many articles, is persuasive and credited, in part, because of Dr. Forsthuber's superior qualifications in immunology. See also Thomas v. Sec'y of Health & Hum. Servs., No. 18-1948V, 2023 WL 5167257, at *5 (Fed. Cl. Spec. Mstr. Aug. 11, 2023) (describing maturation of memory B cells). Dr. Forsthuber summarizes his position that multiple days are required even for a memory response:

> Immunologically, the increase in plasmablasts in the blood by five to seven days after vaccination and booster vaccination and increase in influenza IgG and IgA antibodies is consistent with the time that it takes for the activation of memory B cells by the influenza vaccine and their conversion to plasmablasts, followed by their differentiation into plasma cells.

Exhibit F at 25. Dr. Forsthuber's explanation is consistent with the Claeys article, which Dr. Shafrir cited, in that Claeys and colleagues looked for an anamnestic response on day 7. Exhibit 53 at 204; see also Pet'r's Reply at 9 (discussing Dr. Forsthuber's criticism of Claeys).

Ms. Mosley correctly observes that she had received several influenza vaccinations before the November 2020 vaccination, meaning she likely had preexisting immune memory. For purposes of this analysis, it is assumed that Ms. Mosley's prior influenza vaccinations rendered the November 2020 vaccination a secondary, or anamnestic, immune response rather than a primary response. However, the relevant question is not whether a recall response is faster than a primary response; it is whether the reliable evidence establishes that a response, even a recall response, can produce the sequence of immunologic events necessary to cause transverse myelitis within approximately 36 hours. The evidence credited here does not support that proposition. Although Dr. Shafrir cites Kaiser for the proposition that a secondary response peaks in one to three days, Dr. Forsthuber persuasively explains that even memory B cells must undergo activation and differentiation before producing antibodies, a process requiring several days. Likewise, the Claeys study cited by Dr. Shafrir measured antibody responses seven days after *revaccination*. Thus, the evidence does not establish that an anamnestic response shortens the overall immunologic process sufficiently to conclude a 36-hour onset is biologically plausible.

So far, this analysis has focused on the process by which the body creates antibodies and the time necessary to create antibodies. However, there is more to molecular mimicry. Dr. Forsthuber adds that "these antibodies would need to cross the blood-brain barrier (BBB) and it would take additional time for these antibodies to cause tissue damage in the CNS and time for neurological symptoms to appear in a patient. Of note, antibodies do not freely cross the BBB." Exhibit C at 26-27. Dr. Shafrir did not address how long it could take for the created antibodies to cause damage. This lack of explanation is a significant gap in Dr. Shafrir's overall opinion.

In short, there is very little credible and persuasive evidence that the process of molecular mimicry, even for a recall response, can take place within two days. See Defenza v. Sec'y of Health & Human Servs., No. 18-1601V, 2026 WL 473297, at *6-18 (Fed. Cl. Spec. Mstr. Jan. 7, 2026) (extensive discussion of possible mechanisms by which a vaccine might cause an onset of Guillain-Barré syndrome within 24 hours), mot. for rev. denied, 2026 WL 1742021 (Fed. Cl. June 16, 2026). Accordingly, the analysis proceeds to Dr. Shafrir's other theory, which is based upon cytokines.

**B. Cytokines**

Dr. Shafrir recognizes that a theory based upon cytokines is "probably a more likely explanation" for the short time interval. Exhibit 39 at 51. Cytokines mediate communication between cells to generate an immune response. Dorland's at 460. Because a purpose of vaccinations is to prompt the immune system to activate, vaccinations lead to changes in cytokine levels.

1. *Althen* Prong Three

On the question of timing, preponderant evidence shows that at least some cytokines are increased within 48 hours of a vaccination. See Exhibit 57 (Talaat), Exhibit 39 (Dr. Shafrir's report) at 52 (discussing Talaat); see also Thornton v. Sec'y of Health & Hum. Servs., No. 18-1002V, 2025 WL 2828449, at *20–23 (Fed. Cl. Spec. Mstr. Sept. 4, 2025), mot. for rev. denied, 179 Fed. Cl. 790 (2026). Druery v. Sec'y of Health & Hum. Servs., No. 17-1213, 2023 WL 5094088, at *16 (Fed. Cl. Spec. Mstr. July 11, 2023). Thus, unlike the situation with molecular mimicry in which the physical constraints of the human body make a theory involving antibodies incredibly unlikely to happen within 48 hours, at least *a portion* of a cytokine-based theory can happen within 48 hours. Whether a cytokine-based theory can also explain how a vaccine-recipient can develop an *injury* (such as transverse myelitis) is another question. See Greenslade v. Sec'y of Health & Hum. Servs., No. 14-1140V, 2024 WL 3527665, at *37 (Fed. Cl. Spec. Mstr. June 28, 2024) (relying upon opinion from Ms. Mosley's expert that an increase in cytokines is one step leading to a disease); McGill v. Sec'y of Health & Hum. Servs., No. 15-1485, 2023 WL 3813524, at *36 (Fed. Cl. Spec. Mstr. May 11, 2023).

As discussed in the following section, it is not readily apparent in Dr. Shafrir's report what the increased cytokines do to cause transverse myelitis.

2. *Althen* Prong One

Although a vaccination can cause an increase in some cytokines after vaccination within 48 hours, a simple increase in some cytokines is not sufficient, by itself, to constitute a reliable

theory to explain how the flu vaccine can cause transverse myelitis. Special masters have rejected a theory involving cytokines to explain how vaccines can cause demyelinating conditions. O.M.V. v. Sec'y of Health & Hum. Servs., No. 16-1505V, 2021 WL 3183719 (Fed. Cl. Spec. Mstr. June 16, 2021), mot. for rev. denied, 2021 WL 6124731 (Fed. Cl. Dec. 8, 2021); Bender v. Sec'y of Health & Hum. Servs., No. 11-693V, 2018 WL 3679637 (Fed. Cl. Spec. Mstr. June 2, 2018), mot. for rev. denied, 141 Fed. Cl. 262 (2019).

Based upon three articles, Dr. Shafrir maintains that "Proinflammatory cytokines clearly play a role in the pathogenesis of transverse myelitis." Exhibit 39 at 51, citing Dixit, Graber and Kaplin. Dr. Shafrir further asserts that "peripheral cytokines, through the blood-brain barrier receptor mechanisms, activate immunocompetent cells in the CNS such as astrocytes, microglia, endothelial cells, pericytes and other cells to secrete immunoactive substances. . . and in this way produce short and long term changes in . . . the spinal cord." Id. at 54.

The problem for this cytokine-based theory is that the devil is in the details. A detailed presentation about cytokines comes from Dr. Forsthuber and this comprehensive refutation is consistent with Dr. Forsthuber's much greater experience in the field of immunology. See section VI, above.

Dr. Forsthuber interposes multiple objections to how Dr. Shafrir is using Talaat. See Exhibit C at 27-29. One is that "no significant increase was observed for important inflammatory cytokines implicated in transverse myelitis and neuroinflammatory diseases, such as IL-6."[6] Id. at 27. To the extent that Dr. Shafrir is relying upon a finding that pro-inflammatory cytokines increased, Dr. Forsthuber responds that the Talaat authors "reported a significant increase in the powerful anti-inflammatory cytokine IL-10 in the serum, which would counter-regulate the effects of proinflammatory cytokines on immune cells." Id. at 27-28.

Next, Dr. Forsthuber stated that in Talaat, "the levels of the cytokines reported in this study were very low and ranged in the single-digit picogram (pg) range and were many-fold lower than the levels observed in the CSF of patients with TM and neuroinflammatory diseases." Exhibit C at 28. Dr. Forsthuber continued that the (low) levels reported in Talaat "are much lower than the levels of cytokines . . . required for activation of immune cells." Id. Dr. Forsthuber's observation that the participants in Talaat had relatively low level of increases in cytokines is consistent with their experiences in the sense that the Talaat participants did not experience any severe diseases. See Singleton v. Sec'y of Health & Hum. Servs., No. 17-1474V, 2023 WL 3595653, at *22 (Fed. Cl. Spec. Mstr. May 23, 2023). A connected point is that Dr. Forsthuber criticizes the Talaat study because the researchers "did not include an unvaccinated control group or a placebo injected control group. Without these controls, the authors cannot control for the effects of influenza vaccination against random variations in cytokine/chemokine levels in their subjects." Exhibit C at 29.

---

[6] Dr. Forsthuber qualifies this statement by adding in a footnote: "No significant change noted for individual groups, only when groups from different time points were combined." Exhibit C at 27 n.37.

In addition, Dr. Forsthuber points out that the Talaat researchers studied a relatively small number of people (two groups with ten people per group). Exhibit C at 29. It also seems possible or likely that some participants suffered from concomitant conditions, such as infections, that would, if present, confound any analysis of the effect of a vaccination.

Dr. Forsthuber's criticisms were not persuasively countered by either Dr. Shafrir or Ms. Mosley. Dr. Shafrir, as noted above, did not author a report that was filed after Dr. Forsthuber submitted his report. As to Ms. Mosley, her primary brief did not cite Talaat. See Pet'r's Br. Given the potential importance to Dr. Shafrir's cytokine-based theory, Ms. Mosley should have reinforced an article about which Dr. Shafrir and Dr. Forsthuber disagree so strenuously. In any event, Ms. Mosley later attempted to address some of Dr. Forsthuber's reproaches about the Talaat article. See Pet'r's Reply at 9-10. Specifically, with respect to Dr. Forsthuber's point that some participants in the Talaat study may have had infections, Ms. Mosley argues:

> Dr. Forsthuber also raised a red herring argument in that some of the patients studied experienced different levels of "injection site pain or myalgia … which shows that cytokines can be influenced by factors unrelated to the vaccination." Ex. C at 29-30. While this is true, it merely speaks to the variance in responses to vaccination, the same variance that would cause some individuals (such as Ms. Mosley) to experience a heightened adverse response to flu vaccination, in contrast to the vast majority of people who pass uninjured by the vaccination.

Pet'r's Reply at 9-10.

Here, Ms. Mosley misses Dr. Forsthuber's point. Dr. Forsthuber is saying because of confounding factors, Talaat does not necessarily show the purported "variance *in response to vaccination.*" Instead of being due to a variable response to vaccination, the change in cytokines observed in Talaat could be due to other factors, such as infections. In any event, even in Ms. Mosley's reply, she does not grapple with Dr. Forsthuber's two most significant critiques of Talaat: (1) the increase in some anti-inflammatory cytokines and (2) the increase in pro-inflammatory cytokines remained lower than the levels reported in patients suffering transverse myelitis or other disorders of the central nervous system. Without commentary from either Ms. Mosley or the expert she retained, Dr. Forsthuber has effectively undermined the usefulness of the Talaat study.

Accordingly, the way that Dr. Shafrir uses cytokines as a basis for a theory is too underdeveloped to be persuasive. While vaccinations might lead to a small increase in pro-inflammatory cytokines, vaccinations can also lead to an increase in anti-inflammatory cytokines. Dr. Shafrir has not persuasively proposed any reason why the pro-inflammatory cytokines would win out over the anti-inflammatory cytokines. Thus, with respect to a cytokine-based theory, Ms. Mosley's case falters on prong one.

### C. Summary regarding Dr. Shafrir's Opinion

Dr. Shafrir proposed two theories: one involving molecular mimicry and the other involving cytokines. Each is unpersuasive, although the analysis is slightly different. For

molecular mimicry, there is no persuasive evidence that the biological processes underlying the theory of molecular mimicry can be completed within about 36 hours. In other words, for molecular mimicry, Ms. Mosley's proof for Althen prong three is inadequate. For the theory with cytokines, Ms. Mosley's evidence regarding a theory that starts with the generation of cytokines does not explain why any increase in cytokines leads to transverse myelitis. In other words, her proof for Althen prong one is lacking.

## IX. Conclusion

In November 2020, Ms. Mosley received a flu vaccination, which her employer required, and developed transverse myelitis within about 36 hours. This close temporal connection appears to have led Ms. Mosley to suspect that the vaccination caused the transverse myelitis. To bolster her suspicion, Ms. Mosley has obtained reports from a doctor who began treating her about five months after the vaccination (Dr. Pardo-Vilamizar) and from a doctor she retained in this litigation (Dr. Shafrir). As explained above, these opinions are not persuasive. Thus, Ms. Mosley has failed to meet her burden of proof.

The Clerk's Office is instructed to enter judgment in accord with this decision unless a motion for review is filed. Information about filing a motion for review, including the deadline, can be found in the Vaccine Rules, which are available on the website for the Court of Federal Claims.

**IT IS SO ORDERED.**

s/Christian J. Moran
Christian J. Moran
Special Master

**Medical Literature Appendix**


1. Wafa Akkad et al., Longitudinally Extensive Transverse Myelitis Following Vaccination with Nasal Attenuated Novel Influenza A(H1N1) Vaccine, 67 Arch. Neurol. 1018 (2010); filed as Resp. Ex. A-16.

2. N. Agmon-Levin et al., Transverse Myelitis and Vaccines: A Multi-Analysis, 18 Lupus 1198 (2009); filed as Pet. Ex. 44.

3. Roger Baxter et al., Acute Demyelinating Events Following Vaccines: A Case-Centered Analysis, 63 Clin. Infect. Dis. 1456 (2016); filed as Resp. Ex. A-6 and Resp. Ex. C-3.

4. Carine Claeys et al., Anamnestic Immune Response and Safety of an Inactivated Quadrivalent Influenza Vaccine in Primed Versus Vaccine-Naïve Children, 38 Pediatr. Infect. Dis. J. 203 (2019); filed as Pet. Ex. 53.

5. Puneet Dixit et al., Cytokines and Matrix Metalloproteinases in the Cerebrospinal Fluid of Patients with Acute Transverse Myelitis: An Outcome Analysis, 65 Inflamm. Res. 125 (2016); filed as Pet. Ex. 54.

6. Adam I. Kaplin et al., IL-6 Induces Regionally Selective Spinal Cord Injury in Patients with the Neuroinflammatory Disorder Transverse Myelitis, 115 J. Clin. Invest. 2731 (2005); filed as Pet. Ex. 56.

7. Dimitrios Karussis & Panayiota Petrou, The Spectrum of Post-Vaccination Inflammatory CNS Demyelinating Syndromes, 13 Autoimmun. Rev. 215 (2014); filed as Pet. Ex. 48 and Resp. Ex. A-9.

8. Gary Kaiser, Anamnestic (Memory) Response, in Microbiology (LibreTexts), https://bio.libretexts.org/@go/page/3311; filed as Pet. Ex. 52.

9. Neha Kumar et al., Postvaccination Anti-Myelin Oligodendrocyte Glycoprotein Neuromyelitis Optica Spectrum Disorder: A Case Report and Literature Review of Postvaccination Demyelination, 22 Int'l J. MS Care 85 (2020); filed as Pet. Ex. 49.

10. Lorne S. Label & Donald H. Batts, Transverse Myelitis Caused by Duck Embryo Rabies Vaccine, 39 Arch. Neurol. 426 (1982); filed as Resp. Ex. C-15.

11. Sophie Nguyen et al., Transverse Myelitis Following SARS-CoV-2 Vaccination: A Pharmacoepidemiological Study in the World Health Organization's Database, 92 Ann. Neurol. 1080 (2022); filed as Pet. Ex. 46.

12. Nozomu Sato et al., Acute Transverse Myelitis and Acute Motor Axonal Neuropathy Developed after Vaccinations Against Seasonal and 2009 A/H1N1 Influenza, 50 Intern. Med. 503 (2011); filed as Pet. Ex. 50 and Resp. Ex. A-18.

13. Xiangyu Chianti Shi et al., Assessment of Potential Adverse Events Following the 2022–2023 Seasonal Influenza Vaccines Among U.S. Adults Aged 65 Years and Older, 42 Vaccine 3486 (2024); filed as Resp. Ex. A-8.

14. Kawsar R. Talaat et al., Rapid Changes in Serum Cytokines and Chemokines in Response to Inactivated Influenza Vaccination, 12 Influenza Other Respir. Viruses 202 (2018); filed as Pet. Ex. 57.